UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21-CR-00324 MTS |
| | ) | |
| FREEMAN WHITFIELD IV, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S TRIAL BRIEF

Comes now the United States of America, by and through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and John R. Mantovani and Geoffrey S. Ogden, Assistant United States Attorneys for said district, and submits this brief and memorandum intended as a general guide for the Court. It is not intended as a comprehensive statement of the Government's case, nor is it intended to be in the nature of a bill of particulars that would fix, bind, or in any way limit the Government to a set theory of proof.

## I.    INTRODUCTION

The Indictment charges the defendant Freeman Whitfield IV with the following offenses: (1) conspiracy to distribute and possess with the intent to distribute fentanyl, fentanyl analogues, heroin, and cocaine, in violation of Title 21, United States Code Sections 841(a)(1) and 846; (2) knowingly possess, brandish, and discharge a firearm in furtherance of drug trafficking crimes, causing the death of Antonio Boyd through the use of the firearm, which killing is a murder as defined in 18 U.S.C. §1111, in violation of 18 U.S.C. §§2, 924(c)(1)(A), and 924(j)(1); (3) knowingly possess, brandish, and discharge a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. §924(c)(l)(A); (4) possession with intent to distribute fentanyl, in violation

1

of 21 U.S.C. §841(a)(1); (5) possession of one or more firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. §924(c)(l)(A); (6) felon in possession of a firearm, in violation of 18 U.S.C. §922(g); and (7) felon in possession of ammunition, in violation of 18 U.S.C. §922(g).

The events set forth below involve a long-term, organized narcotics trafficking organization, which involved the defendant's murder of Antonio Boyd in furtherance thereof, and the Government will present extensive evidence of the same as outlined in the facts section below, including, but not limited to, recorded Title III electronic intercepts as well as recorded jail telephone calls, transcripts of recorded calls, eyewitness testimony of narcotics transactions, significant drug seizures, recorded interviews, expert witness testimony, and financial transactions. The Government will also offer evidence that includes co-conspirator statements made in furtherance of this drug distribution conspiracy, which resulted in the death of Antonio Boyd.

The Government has provided its initial notice of anticipated expert testimony. The Government anticipates presenting expert testimony to explain basic drug trafficking methods to the jury. The scope of the testimony will be consistent with that allowed by existing Eighth Circuit precedent. The United States will also present evidence pursuant to Rule 404(b) tending to show the defendant's motive, intent, knowledge, absence of mistake, or lack of accident. The United States will also present evidence of a recorded 9-1-1 call in the aftermath of Boyd's murder under Fed. R. Evid 803(2) and will also enter into evidence photographs taken at the crime scene.  Finally, the Government has provided initial notice of self-authenticating records to be offered and admitted under Federal Rule of Evidence 902.

## II.    RELEVANT FACTS

The following facts are *not* intended to be a comprehensive statement of the Government's case, they are *not* the totality of the facts to be presented at trial, and they are *not* a bill of particulars

2

that would fix, bind, or in any way limit the Government to specific items of evidence or a set theory of proof.   They are intended to serve as a general roadmap of the evidence the Government intends to present to the jury.

    **A.**    **Introduction and Background**

    1.    This case involves an organized criminal conspiracy to distribute and possess with intent to distribute cocaine, heroin, fentanyl, and fentanyl analogues in the Eastern District of Missouri and elsewhere. The defendant Freeman Whitfield IV (a/k/a "Furley," "Furley Beam," "F.B.," and "Mr. Furley,") was identified as a street-level distributor of these controlled substances to the conspiracy's customers.   In furtherance of this ongoing drug distribution conspiracy, the defendant murdered Victim Antonio Boyd and shot Victim Charles Whitfield (no relation.)

    **B.**    **Underlying Drug Distribution Conspiracy Involving Kennerson Gooden, Guy Goolsby, Grant Berry, Antonio Boyd, the Defendant, Byron Green, & Others**

    2.    From March of 2018 until October of 2018, DEA investigated a multi-state drug distribution conspiracy involving the transportation of controlled substances from Houston, Texas and Fort Lauderdale, Florida to the St. Louis area.   The investigation was run primarily by Task Force Officers James Gaddy, Joseph Somogye, and Eric Lanham but included numerous other law enforcement personnel.   The investigation resulted in the seizure of substantial drug quantities and drug proceeds, as well as luxury vehicles and watches, including $1,304,800 in drug payments, 25 kilograms of cocaine, 3 kilograms of fentanyl, $263,000 in drug payments, and 10 kilograms of heroin. *See United States v. Guy Goolsby at al*, 4:19-CR-412 AGF.   Kennerson Gooden (a/k/a Ken Dodd) was the source of supply in Houston, Texas; Guy Goolsby (a/k/a "Ricochet" and "Shay") and Grant Berry (a/k/a "Kojak" and "Jak") were the primary St. Louis large-scale distributors for this conspiracy, and Antonio Boyd received drugs to distribute from Goolsby.   By

3

mid-to-late 2018, investigators were able to develop a confidential source who had facilitated the deliveries of controlled substances to Goolsby, Berry, and others.

3.      Antonio Boyd, a/k/a "TT," was arrested on March 21, 2018 after a state search warrant was executed at his home. Investigators seized approximately 500 grams of cocaine and two firearms. Boyd cooperated with investigators and identified Guy Goolsby as a high-level drug distributor in St. Louis.

4.      As the investigation progressed into late 2018, investigators began monitoring/intercepting multiple cellular phones used by Goolsby.  Investigators were able to identify additional drug distributors being sourced by Goolsby, to including but not limited to the defendant Freeman Whitfield (a/k/a "Furley," Furley Beam," "F.B.," and "Mr. Furley"), and co-conspirator Byron Green (a/k/a Bryan Green, "Big B," and "B").

5.      On January 24, 2019, Green and the defendant attempted a drug pick-up from Goolsby. Intercepted communications revealed conversations between Goolsby and Green discussing an unknown quantity of drugs being provided by Goolsby, with Goolsby instructing Green that it was "under the seat."  Surveillance units observed Green and the defendant, in a stolen Toyota Camry, approach Goolsby's Jeep Grand Cherokee, which was parked and unoccupied. However, they were unable to access the interior because Goolsby did not unlock the doors.

6.      On January 27, 2019, Investigators observed the defendant and Green, in the same stolen Toyota Camry, conduct several hand-to-hand drug transactions.

7.      On February 5, 2019, investigators observed the defendant and Green conduct additional hand-to-hand transactions using a different vehicle. Green observed police surveillance, and investigators subsequently monitored a call from Green to Goolsby to inform him. Later that

same day, Goolsby placed an intercepted call to the defendant, who was using (217) 767-6483 (hereinafter: Defendant's Telephone #1), stating Green was not answering the phone, with the defendant stating he did not know where Green was either but would check up on him.

###    C.    Antonio Boyd Cooperates with the DEA

8.    On May 29, 2019, the United States indicted Goolsby, Boyd, and thirteen others in the aforementioned federal indictment (Case No. 4:19-CR-412 AGF (PLC)). Goolsby was detained, and Boyd was released on bond. Boyd agreed to cooperate with the DEA and the United States Attorney's Office in the prosecution of Goolsby and other members of the conspiracy. Boyd, with his lawyer present, met with the DEA and USAO on July 25, 2019 in connection with this cooperation.   From that meeting to December 9, 2019, Boyd was signed up as a DEA confidential informant and conducted three separate meetings with DEA personnel.   At several of these meetings, Boyd brought numerous family members with him.

###    D.    The Defendant Murders Antonio Boyd

9.    On December 9, 2019, at 12:11 PM, Boyd's fiancé and co-habitant, Kathy Queen, called 9-1-1 in hysterics and told the dispatcher her fiancé had been shot and was dying.   During the call, while screaming and crying, she stated Boyd had "a case coming that that he was going to testify against somebody."   Moments later, members of the St. Louis Metropolitan Police Department (SLMPD) arrived at 2522 West Palm Street in St. Louis, Missouri (Boyd's residence), and discovered Boyd had been shot and was dead outside of the residence.   During the shooting, Charles Whitfield, who has no relation to the defendant, had also been shot in his legs.

10.    SLMPD Homicide detectives conducted an on-scene investigation.   Detectives and evidence technicians located five brass-colored .45 Auto CCI Blazer spent shell casings in the roadway near where Boyd and C. Whitfield were shot. Investigators photographed the scene and

took several crime scene photographs of Boyd's body lying on the sidewalk showing the position of his body and his entry wounds.

11.     Witnesses recounted that Boyd had been working on C. Whitfield's vehicle in front of the residence, that a silver sedan traveling west on West Palm drove up to them, and that the driver of the sedan shot at Boyd and C. Whitfield multiple times before driving away.

12.     Security footage at a nearby business depicted the silver sedan, fleeing northeast from the area of the shooting at a high rate of speed one block away just after the shooting took place.

### E.     Recorded Calls Between the Defendant and Tydarryl Griffin

13.     Initially thought to be unrelated to this investigation, DEA was also investigating drug trafficking activity involving Tydarryl Griffin for fentanyl distribution.   Pursuant to court authorization, DEA was also monitoring and recording the voice communications from Griffin's cell phone.

14.     On December 10, 2019, the day after the shooting, Griffin contacted and spoke to the defendant's mother, Talisha Nabors.   Griffin told Nabors he was willing to assist the defendant and asked her to have the defendant contact him (Griffin). Toll records from Nabors cell phone demonstrate that Nabors called (774) 356-1103 within seconds of her conversation with Griffin.

15.     On December 12, 2019, the defendant, utilizing (774) 356-1103 (hereinafter: **Defendant's Telephone #2**), contacted Griffin. This call was also monitored and recorded. During the conversation, Griffin, mistakenly, informed the defendant that a specific witness known to Griffin and the defendant was present at the shooting, and that witness had told the police that the defendant was the shooter. In response, the defendant disputed this witness's presence, correctly stating that that witness was not at the scene of the shooting.

6

**F.**     **Identifying and Confirming The Defendant's Previous Use of (774) 356-1103 (Defendant's Telephone #2)**

16.     Once investigators had identified Defendant's Telephone #2, investigators confirmed that the defendant possessed and used **Defendant's Telephone #2** before and after he murdered Boyd on December 9, 2019.   Investigators discovered that the defendant used **Defendant's Telephone #2** from late October 2019 to the end of December of 2019 to have a series of phone conversations, all of which were recorded, with Missouri Department of Corrections (MDC) inmates. The defendant identified himself on some of those calls, and his identity was further confirmed through voice comparisons of the jail calls and the intercepted calls throughout the investigation.   During some of these conversations, the defendant discusses co-conspirators Goolsby, Green, and the location of the murder, and can be heard conducting a drug transaction with unknown third parties while on the phone.

**G.**     **Historical Cell Site Analysis of Defendant's Telephone #2**

17.     On December 18, 2019, the investigative team obtained a federal historical cell-site information warrant, Cause No. 4:19-MJ-0454 DDN, with respect to **Defendant's Telephone #2** and T-Mobile provided the requested data.

18.     The investigative team utilized the assistance of the Federal Bureau of Investigation's (FBI) Cellular Analysis Survey Team (CAST) in order to analyze the data. Special Agent Bastian Freund, FBI, conducted the analysis.

19.     SA Freund, as outlined in his *Curriculum Vitae* has 20 years of experience as an FBI Special Agent, working in the cellular field since 2007 and as a certified CAST member since 2015. *See* Attachment 3.   SA Freund has received over 900 hours of training in cellular networking, radio frequency technology, and historic cellular records interpretation.

7

20.     When called to testify as an expert in the field of historical cell-site analysis, SA Freund will testify that he has received extensive training by the FBI and major cellular providers as to how to interpret and map the location information provided by the phone companies as part of their business records. *Id.*

21.     He will further testify about basic cellular phone operation (i.e. that a cellular phone will most likely connect to an available cell tower with the strongest and clearest signal) and how it is possible to determine the general location of a cell phone as it is used to make and receive calls based on which sector of a cell tower the cellular phone connects to. *Id.*

22.     SA Freund will testify that he was given the date and time of the murder in this case, and that he reviewed the date and time in connection with the cell phone records in question.

23.     SA Freund will testify that his review and analysis of the T-Mobile records with respect to **Defendant's Telephone #2** revealed that, on December 9, 2019, before Boyd's murder, **Defendant's Telephone #2** utilized a cellular tower in Berkeley, Missouri. However, several minutes before the murder, **Defendant's Telephone #2** began utilizing cellular towers in a line indicating the defendant was driving towards Boyd's residence.   At the time of the shooting, the path of cellular tower connections show that **Defendant's Telephone #2** was in the immediate vicinity of the murder scene.   Moments after the shooting, **Defendant's Telephone #2** then began connecting to cellular towers and drawing a path away from the shooting location, ultimately ending up in the vicinity of the Spanish Cove Apartment Complex in Spanish Lake, Missouri.

24.     SA Freund will further utilize a map to demonstrate for the jury the location of the cell towers triggered by **Defendant's Telephone #2** at the relevant times on December 9, 2019.

25.     SA Freund will *not* testify about **Defendant's Telephone #2** precise location using this method of historical cell-site location analysis and will not include specific distances between

8

the phone and the cell towers. Rather, his testimony will be limited to informing the jury that a particular phone received or made a series of calls at several different specific times, and that the phone was located within an approximate geographical area of the cell towers represented in the demonstrative maps at the time of those calls.

### H.    The Defendant's Continued Drug Distribution Through 2021

26.    The defendant continued to distribute narcotics through 2021.   A separate DEA investigative team opened an investigation into drug trafficking in St. Louis, Missouri in January 2020, where they would conduct controlled purchases utilizing undercover law enforcement officers or confidential sources.

27.    These undercover officers would wear a video/audio recording device during the sales.   In March and July 2020, several of these transactions were conducted directly with the defendant. On March 10, 2020, an undercover detective (UC) arranged a transaction with the defendant, who had discontinued using the **Defendant's Telephone #2** and was using a different cell phone.   The UC met with the defendant and purchased fentanyl directly from him. Moreover, the video recording device worn by the UC clearly depicts the defendant conducting the hand-to-hand transaction.

28.    Throughout 2020 and into 2021, the defendant continued to conduct transactions with customers, after which the drug users were stopped by the investigative team, or at the least investigators covertly observed the transactions.

### I.    The Defendant's Possession of Fentanyl, Firearms, and Ammunition.

29.    In March 2021, the investigative team identified two residences the defendant was using in furtherance of his drug distribution: 12388 Tributary, Apartment I, Maryland Heights, Missouri (subject location #1); and 275 Union Blvd., Apartment 517, St. Louis, Missouri (subject

9

location #2).   Investigators would observe the defendant coming from and going to these residences in connection with drug transactions. A covert camera was installed in the hallway leading to the apartment door of subject location #2.   Over several successive days in late April and early May of 2021, the defendant is clearly seen entering and exiting the apartment with a specific backpack.

30.     On May 4, 2021, investigators executed federal premises search warrants for subject location #1 and #2.   The defendant was present at subject location #1 and taken into custody. Investigators seized a Draco AK-style pistol, and multiple magazines, in a backpack worn by the defendant on numerous occasions and earlier that day, along with multiple other firearms and ammunition, and a substantial amount of US currency made from the sale of drugs.

31.     The search of subject location #2 revealed an AR-15 style pistol, a Glock pistol, numerous high-capacity and drum magazines, thousands of rounds of ammunition including a 50 round box of .45 Auto CCI Blazer Brass ammunition missing 19 cartridges, a ballistic vest with rifle-resistant body armor, a police scanner, a large amount of US currency, digital scales, six cell phones, and approximately 1,217 grams of fentanyl.

### J.     The Defendant's Admissions to Drug Distribution

32.     The defendant was transported to the DEA office for an interview. The defendant made numerous incriminating statements and admissions to TFOs Gaddy and Somogye about his drug distribution on the way to the interview and during the booking process.   This extensive conversation was captured on video recordings from the DEA booking area, but it was not audio recorded.   Once the defendant entered the formal interview room and the video/audio recording equipment was turned on, the defendant made blanket denials about any knowledge of the murder. Barring any testimony from the defendant at trial that is in opposition to those denials, the

Government does not seek to make any mention of those self-serving denials or his subsequent request for an attorney.

### K. Post-Arrest Recorded Jail Calls

33.     The defendant made several incriminating jail calls after he was arrested. These include a conversation with a paramour admitting to possession of the residences the police raided that morning and instructing her to tell co-conspirator Green to meet/talk with another person.   He had another conversation on the same day with an unknown male, again admitting the police raided <u>his</u> residences, including describing how the police had a camara on the door of <u>his</u> residence with the red couch (275 Union Blvd, Apt. 517, St. Louis, MO).   Further, in that same call, in an effort to protect co-conspirators from law enforcement intervention and to further the conspiracy, the defendant directed the unknown male to contact Green and tell him that law enforcement had been able to identify vehicles he and Green had been using in the past and to be careful.

### L. Defendant's Prior Convictions for Drug Distribution Activities

34.     Prior to the events of this case, on May 22, 2017, the defendant pleaded guilty to and was convicted of two counts sale of a controlled substance in *State of Missouri v. Freeman Whitfield*, 1622-CR04592-01 in the 22nd Judicial Circuit Court of the City of St. Louis, State of Missouri. *See* Attachment #1. Specifically, as to Count 1, on June 6, 2016, the defendant sold heroin to a St. Louis Metropolitan Police Department (SLMPD) undercover detective in the area of the intersection of Billups and Cottage Avenues in the City of St. Louis. *Id*, Indictment pg. 1. As to Count 2, on June 9, 2016, the defendant sold heroin to the same SLMPD undercover detective on Chambers Street in the City of St. Louis. *Id*.

35.     Also, on May 22, 2017, the defendant pleaded guilty to and was convicted of one count of distribution of a controlled substance, two counts unlawful use of a weapon – one

possession of a weapon while possessing heroin, and one count of felony resisting arrest (Count 4) in *State of Missouri v. Freeman Whitfield* under cause number 1622-CR02681-01 in the 22nd Judicial Circuit Court of the City of St. Louis, State of Missouri. *See* Attachment #2.   Specifically, on June 16, 2016, the defendant, working with another man, sold heroin to the same SLMPD undercover detective on Minnesota Avenue in the City of St. Louis. *Id*, Indictment pg. 2.   During the transaction, the defendant was armed with a .45 caliber Mac-10 semi-automatic pistol. *Id*.

### III.   ELEMENTS OF THE CHARGED CRIMES

#### A.   Conspiracy to Possess and Possess with the Intent to Distribute Fentanyl, Fentanyl Analogues, Heroin and Cocaine

Count One of the Indictment charges the defendant with a conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl, 100 grams or more of fentanyl analogues, and 1 kilogram or more of heroin, in violation of Title 21, United States Code, Section 846.   The elements of this violation are that (1) the defendant and at least one other person reached an agreement to distribute or possess with the intent to distribute these controlled substances; (2) the defendant voluntarily and intentionally joined in the agreement, either at the time it was first reached or some later time while the agreement was still in effect; (3) the defendant knew the purpose of the agreement at the time he joined; and (4) the offense involved 400 grams or more of fentanyl, 100 grams or more of fentanyl analogues, or 1 kilogram or more of heroin

#### B.   Possessing, Brandishing, and Discharging a Firearm in Furtherance of Drug Trafficking Crimes, Causing the Death of Antonio Boyd

Count Two of the Indictment charges the defendant with knowingly possessing, brandishing, and discharging a firearm in furtherance of drug trafficking crimes, which caused the death of Antonio Boyd, which killing is a murder, in violation of 18 U.S.C. §§2, 924(c)(1)(A), and 924(j)(1). The elements of this violation are that (1) the defendant committed the crime of

conspiracy to distribute and to knowingly and intentionally possess with the intent to distribute fentanyl, fentanyl analogues, heroin, and cocaine, as charged in Count One; (2) the defendant knowingly possessed, brandished, and discharged a firearm in furtherance of that crime; and (3) the defendant used the firearm to cause the death of Antonio Boyd.

### C.   Possessing, Brandishing, and Discharging Firearm in Furtherance of Drug Trafficking Crime

Count Three of the Indictment charges the defendant with knowingly possessing, brandishing, and discharging a firearm in furtherance of drug trafficking crimes, in violation of 18 U.S.C. §924(c)(1)(A).   The elements of this violation are that (1) the defendant committed the crime of conspiracy to distribute and to knowingly and intentionally possess with the intent to distribute fentanyl, fentanyl analogues, heroin, and cocaine, as charged in Count One; and (2) the defendant knowingly possessed, brandished, and discharged a firearm in furtherance of that crime.

### D.   Possess of Fentanyl with Intent to Distribute

Count Four of the Indictment charges the defendant with possession with the intent to distribute 400 grams or more of a mixture or substance containing fentanyl.   To establish that a defendant possessed a controlled substance with the intent to distribute it under 21 U.S.C. §841(a)(1), the Government has to establish beyond a reasonable doubt that the defendant (1) knowingly (2) possessed 400 grams or more of fentanyl (3) with the intent to distribute it.   *See United States v. Marquez*, 462 F.3d 826 (8th Cir. 2006).   The defendant need not know what the controlled substance is if he knows he has possession of some controlled substance.   *United States v. Ramos*, 814 F.3d 910, 915 (8th Cir. 2016), as corrected (Feb. 23, 2016).

### E.   Possession of Firearms in Furtherance of Drug Trafficking

Count Four of the Indictment charges the defendant with knowingly possessing one or

more firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. §924(c)(1)(A). The elements of this violation are that (1) the defendant committed the crime of knowingly and intentionally possessing with the intent to distribute fentanyl, as charged in Count Four; and (2) the defendant knowingly possessed one or more firearms in furtherance of that crime.

###### F.   **Possession of Firearms by a Convicted Felon**

Count Five of the Indictment charges the defendant with being a felon in possession of a firearm in violation of 18 U.S.C. §922(g).   The elements of this violation are that (1) the defendant had been convicted of a crime punishable by imprisonment for more than one year; (2) after that, the defendant knowingly possessed a firearm; (3) at the time the defendant knowingly possessed the firearm, he knew he had been convicted of a crime punishable by imprisonment for more than one year; and (4) the firearm was transported across a state line at some time during or before the defendant's possession of it.

###### G.   **Possession of Ammunition by a Convicted Felon**

Count Six of the Indictment charges the defendant with being a felon in possession of ammunition in violation of 18 U.S.C. §922(g).   The elements of this violation are that (1) the defendant had been convicted of a crime punishable by imprisonment for more than one year; (2) after that, the defendant knowingly possessed ammunition; (3) at the time the defendant knowingly possessed the ammunition, he knew he had been convicted of a crime punishable by imprisonment for more than one year; and (4) the ammunition was transported across a state line at some time during or before the defendant's possession of it.

## IV.   **LEGAL ISSUES**

The Government will present evidence establishing a long-term, complex drug trafficking conspiracy involving the defendant and others, both known and unknown. The evidence includes,

but is certainly not limited to, intercepted wire and electronic communications, recorded interviews, eye-witness testimony, controlled drug purchase operations, surveillance footage, eye-witness accounts, precision location information data, physical evidence seized directly from the defendant and others, and expert testimony.   The evidence to be presented is substantial, and the nature of both the charged conspiracy and the investigation that uncovered it are complex.

### A.       The Drug Trafficking Conspiracy

Evidence adduced at trial will establish the existence of a drug trafficking and distribution conspiracy.   The evidence will show that the defendant knew of the conspiracy, and intentionally joined it.   Simply put, he conspired to acquire, transport, and distribute controlled substances in furtherance of this long-term conspiracy and to make money for himself.

Pursuant to 21 U.S.C. § 846, the government must prove: "(1) that there was a conspiracy to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Sanchez*, 789 F.3d 827, 834 (8th Cir. 2015). "In order to prove the existence of a conspiracy, 'the government must show an agreement between at least two people and that the agreement's objective was a violation of the law.'"   *United States v. Jenkins*, 78 F.3d 1283, 1287 (8th Cir. 1996) (*quoting United States v. Escobar*, 50 F.3d 1414, 1419 (8th Cir. 1995)).   The essence of a conspiracy is an agreement between two or more participants to achieve a particular illegal end.   *United States v. Santos*, 541 F.3d 63, 71 (2nd Cir. 2008).   "A single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions." *United States v. Donnell*, 596 F.3d 913, 923 (8th Cir. 2010) *cert. denied*, 131 S. Ct. 309 (2010) and *cert. denied*, 131 S. Ct. 994 (2011).

Proof of a formal agreement is unnecessary; an implied understanding is sufficient.

*United States v. Hoelscher*, 914 F.2d 1527, 1534 (8th Cir. 1990).   That is, the agreement may be tacit and based upon the actions of the defendant and others.   *Donnell*, 596 F.3d at 923.   Proof of an overt act in furtherance of the conspiracy is also not required.   *United States v. Shabani*, 115 S. Ct. 382, 383 (1994); *United States v. White*, 408 F.3d 399, 401 (8th Cir. 2005); *United States v. Johnson*, 2012 WL 1382519 at *2 (E.D. Mo. 2012).

To be a conspirator, one does not have to be aware of the existence of all other conspirators or all the details of the conspiracy.   *United States v. Huggans*, 650 F.3d 1210, 1222 (8th Cir. 2011) *cert. denied*, 132 S.Ct. 1583 (2012).   However, the Government must show some element of cooperation beyond mere knowledge of the existence of the conspiracy.   *United States v. Slagg*, 651 F.3d 832, 840 (8th Cir. 2011) (finding record was "replete" with evidence of regular cooperation between conspirators from which jury could infer "ongoing, facilitative relationship between parties who were aware of the scope of one another's activities") (quoting *United States v. Roach*, 164 F.3d 403, 412 (8th Cir. 1998)).   A defendant may be criminally liable for any substantive crime committed by a co-conspirator in the course and furtherance of the conspiracy. *United States v. Bowie*, 618 F.3d 802, 815 (8th Cir. 2010).

Finally, a conspirator need not join a conspiracy at its inception.   Each person joining a conspiracy is taken to adopt, and is bound by, the prior acts and statements made in furtherance of the common objective.   *See United States v. Foxx*, 544 F.3d 943, 953 (8th Cir. 2008) ("When a defendant joins a conspiracy in its later stages, the concept of foreseeability (a forward-looking concept) must be turned around 180 degrees and be applied to the conduct of co-conspirators occurring before the entry of [that] particular defendant") (alterations in original) (internal quotation marks omitted).   In fact, once proof of a conspiracy is shown, only slight additional evidence is necessary to connect a particular defendant with it.   *United States v. Hayes*, 391 F.3d

958, 961 (8th Cir. 2004); *United States v. Mathison*, 157 F.3d 541, 551 (8th Cir. 1998).

To prove a conspiracy, the government need not show its precise contours, only its existence and the defendant's willing participation.  *Id.*, *citing United States v. Slagg*, 651 F.3d 832, 840 (8th Cir. 2011).   A conspiracy may be a "loosely knit organization."  *Id.*, *quoting United States v. Baker*, 855 F.2d 1353, 1357 (8th Cir. 1988).   Members of the conspiracy may change over time.  *Id.*, *citing Slagg*, 651 F.3d at 840.   A conspiracy to distribute controlled substances may be established by the testimony of co-conspirators, which is often corroborated by investigation.  *Id.*, *citing United States v. Espinoza*, 684 F.3d 766, 776 (8th Cir. 2012); *United States v. Rodriguez-Ramos*, 663 F.3d 356, 362 (8th Cir. 2011).

Proof of conspiratorial intent, of course, may be established through circumstantial evidence. *United States v. Santos*, 541 F.3d 63, 72 (2nd Cir. 2008), citing *United States v. Gore*, 154 F.3d 34, 40 (2nd Cir. 1998).   In fact, the Government may rely "wholly on circumstantial" evidence to prove the existence of a conspiracy.  *Donnell*, 596 F.3d 913 at 923.   Where there is evidence the defendant had knowledge of the conspiracy and knowingly took actions advancing the conspiracy's aims, the jury is ordinarily permitted "to infer intent and agreement from knowledge," particularly in the context of the defendant's "interested cooperation, stimulation, and instigation," or when the defendant has a "stake in the venture."  *Id.*, *quoting United States v. Zambrano*, 776 F.2d 1091, 1095 (2nd Cir. 2985).   "The defendant's participation in a single transaction, on an appropriate record, suffice to sustain a charge of knowing participation in an existing conspiracy."  *Id.*, *citing United States v. Miranda-Ortiz*, 926 F.2d 172, 176, *cert. denied*, 502 U.S. 928 (1991).   "The defendant need not know the identities of all the other conspirators, nor all of the details of the conspiracy."  *Id.*, *quoting Gore*, 154 F.3d at 40.   "A defendant need not have joined a conspiracy at its inception or in order to incur liability for the unlawful acts

committed both before and after he or she became a member.   *Id.*, *citing United States v. Rea*, 958 F.2d 1206, 1214 (2nd Cir. 1992).

The United States will present extensive evidence from which a reasonable jury may find that: (1) there was a conspiracy to distribute and possess with intent to distribute controlled substances; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly joined the conspiracy and participated in the distribution of controlled substances.

### B.  Co-conspirator Statements and Admissions

The Government will offer evidence of co-conspirator statements made in furtherance of this drug distribution conspiracy.   Moreover, some of the statements will also be offered as direct admissions and/or adoptive or tacit admissions.   The Government moves for a preliminary ruling, pursuant to *United States v. Bell*, 573 F. 2d 1040, 1044 (8th Cir. 1978), that these statements are admissible.   The statements would be admitted conditionally, subject to the requisite foundation being laid.

In *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978), the Eighth Circuit established a procedure for the district court to employ when faced with a co-conspirator's statement.   In part, the *Bell* court stated, "[i]f the prosecutor propounds a question which obviously requires a witness to recount an out-of-court declaration of an alleged coconspirator, the court, upon a timely and appropriate objection by the defendant may conditionally admit the statement."   *Id.* at 1044. Under *Bell*, after a statement is conditionally admitted, the district court makes a final ruling regarding admissibility at the conclusion of the evidence "as to whether the government has carried its burden of proving by a preponderance of the evidence that the statement was made during the course . . . of the conspiracy."   *United States v. Chahia*, 544 F.3d 890, 897 n.4 (8th Cir. 2008) (citing *United States v. Bell*, 573 F.2d at 1044).

Under *Bell*, it is the district court who makes the determination whether the government has proven, by a preponderance of the evidence that the conspiracy existed. *Bell*, 573 F.2d at 1044. A court may consider the co-conspirator's statement itself when determining whether a conspiracy existed, however, the Government must produce independent evidence to establish the existence of the conspiracy. *Blakeney*, 876 F.3d at 1134; *Whitlow*, 815 F.3d at 434.  It is solely the role of the district court to evaluate witness credibility in making that determination. *Llach v. United States*, 739 F.2d 1322, 1329 (8th Cir. 1984) ("[T]he trial judge has wide discretion and must be satisfied only that there is independent evidence, credible and sufficient to support a finding of a joint undertaking.")

Preliminarily, the Federal Rules of Evidence provide that a statement is not hearsay when it "is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); *see also United States v. Young*, 753 F.3d 757, 771 (8th Cir. 2014).  The evidentiary predicates for admissibility of a co-conspirator's statements are: "(1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." *United States v. Blakeney*, 876 F.3d 1126, 1134 (8th Cir. 2017) (quoting *United States v. Beckman*, 222 F.3d 512, 522 (8th Cir. 2000)).  Notably, for this exclusion to apply, there is no requirement that the declarant be unavailable. *United States v. Inadi*, 475 U.S. 387 (1986); *United States v. Gardner*, 447 F. 3d 558, 561 (8th Cir. 2006). Moreover, "for the purposes of Rule 801(d)(2)(E), it is irrelevant whether the witness was a member of the conspiracy or acting in furtherance of the conspiracy." *United States v. Dinwiddie*, 618 F. 3d 821, 836 (8th Cir. 2010).

For a co-conspirator's statement to be admissible at trial, the existence of the conspiracy

and the defendant's and declarant's complicity in the conspiracy must be proved only by a preponderance of evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Cowling*, 648 F.3d 690, 698 (8th Cir. 2011). In *Bourjaily*, the Supreme Court held that a court may consider the hearsay statements themselves for the purpose of making the preliminary factual findings required by Rule 801(d)(2)(E). *Id*. at 178; *see also United States v. Ragland*, 555 F.3d 706, 713 (8th Cir. 2009). In addition, the necessary preliminary findings may be supported completely by circumstantial evidence, or a defendant's own conduct and admissions. *Id*. at 181. *See also United States v. Townsley*, 843 F.2d 1070, 1084 (8th Cir. 1988).

"In order to admit a statement under Rule 801(d)(2)(E), the district court must 'find by a preponderance of the evidence that a conspiracy existed involving the declarant and the party against whom the statement is offered and that the statements were made by the declarant in the course of and in furtherance of the conspiracy.'" *United States v. Cowling*, 648 F. 3d 690, 698 (8th Cir. 2011). The trial court may consider the hearsay statements themselves for the purpose of making the preliminary factual findings required by Rule 801(d)(2)(E). *Bourjaily v. United States*, 483 U.S. 171 (1987). In addition, the requisite preliminary finding may be supported completely by circumstantial evidence or by a defendant's own conduct and admissions. Co-conspirator statements may be admitted conditionally, subject to evidence being later introduced that the statements were made by a coconspirator during the course and in furtherance of the conspiracy. *United States v. Bell*, 573 F. 2d 1040, 1044 (8th Cir. 1978). Ultimately, this Court must make explicit findings on whether the Government has ultimately met its burden of establishing the required foundation for challenged coconspirator statements. *Cowling*, 648 F. 3d at 698, *citing United States v. Spotted Elk*, 548 F. 3d 641, 661 (8th Cir. 2008). The record should reflect careful consideration of the foundational requirements in light of any objections or requests

for rulings.   *United States v. Roach*, 164 F. 3d 403 (8th Cir. 1998).

### 1. *The statements were made during the course of the charged conspiracy*

The first of the foundational requirements for admissibility under Rule 801(d)(2)(E) requires that the Government prove by a preponderance of the evidence that the proffered statements were made "during the course of" the charged conspiracy.

The language "during the course and in furtherance of the conspiracy" has been afforded a broad construction under Rule 801(d)(2)(E).   *Ragland*, 555 F.3d at 713 (8th Cir. 2009); *United States v. Cazares*, 521 F.3d 991, 999 (8th Cir. 2008).   Since the statements must advance the objectives of the conspiracy, the nature of the statements, along with when and under what circumstances they were made, must be considered.   *United States v. Mayberry*, 896 F.2d 1117, 1121 (8th Cir. 1990); *Ragland*, 555 F.3d at 713.   Accordingly, the "in furtherance" requirement is satisfied where the statement in question furthers in any way objectives of the conspiracy. *United States v. Manfre*, 368 F.3d 832, 838 (8th Cir. 2004); *United States v. Guerra*, 113 F.3d 809, 814 (8th Cir. 1997).

Whether the statements were made "during the course of the conspiracy" depends upon the nature of the particular conspiracy alleged.   *United States v. Handy*, 668 F. 2d 407, 408 (8th Cir. 1982).   While the time frame alleged in the indictment does not absolutely establish its "course," *Grunewald v. United States*, 353 U.S. 291, 407 (1957), it is well-established that the conspiracy "continues" so long as the evidence shows a "continuity of action" aimed at accomplishing the purposes of the conspiracy.   *Fiswick v. United States*, 329 U.S. 211, 216 (1946).   "A conspiracy is presumed to exist until there has been an affirmative showing that it has been terminated so long as there is 'a continuity of purpose and continued performance of acts.'"   *United States v. Williams*, 87 F. 3d 249, 253 (8th Cir. 1996).

In the instant case, the Indictment alleges that the conspiracy to distribute cocaine, heroin and fentanyl began on an unknown date but included March 13, 2018, through December 9, 2019, and continued thereafter.     Each of the statements the Government will introduce at trial pursuant to Rule 801(d)(2)(E) was made no earlier than March 13, 2018.   Nearly all of the statements the Government intends to introduce in this case consist of recorded wire intercepted telephone calls, as well as recorded jail telephone calls, all of which took place during the period of time covering the charged conspiracy. There is thus no question that the statements were made during the course of the conspiracy.

## 2.   *The statements were made in furtherance of the conspiracy*

Prior to admitting any statements pursuant to Rule 801(d)(2)(E), the Court must next determine whether the Government has demonstrated by a preponderance of the evidence that the statements were made "in furtherance of the conspiracy."   In determining whether the Government has satisfied the "in furtherance" requirement, the Court must determine whether the statement in question furthers in any way the common objective of the conspiracy.   *United States v. Moss*, 138 F. 3d 742 (8th Cir. 1998).   If it does, the statement is made "in furtherance" of the conspiracy for purposes of Rule 801(d)(2)(E).   The phrase "in furtherance of the conspiracy" is to be interpreted broadly.   *United States v. Cazares*, 521 F. 3d 991, 999 (8th Cir. 2008). Statements that describe past events are in furtherance of the conspiracy if they are made to plan future activities.   *United States v. Haldeman,* 559 F.2d 31, 110-11 (D.C. Cir. 1976). In the context of a drug conspiracy, statements are in furtherance of the conspiracy if they 'discuss the supply source for the illegal drugs . . . or identify a coconspirator's role in the conspiracy. . .''   *Id*.   These are precisely the nature of the statements the Government will seek to admit at trial.   A majority of the statements to be introduced are intercepted telephone calls between the defendant, Goolsby,

22

and Green that directly concern the transfer of drugs from Goolsby to Green and the defendant to arranging physical meetings to transfer drugs.   The calls are made to further the goal of the conspiracy to distribute drugs for a profit and are statements made in furtherance of the conspiracy.

Additionally, the statements of Tydarryl Griffin to Talisha Nabors, Nabors statement to the defendant, and Griffin's statements to Whitfield were made in furtherance of the conspiracy as well and are admissible.   Griffin made contact with both Nabors and the defendant for the express purpose of assisting the defendant in avoiding law enforcement detection for Boyd's murder. Such a purpose is categorically in furtherance of the overall drug trafficking conspiracy, as Boyd's murder was itself in furtherance of that same conspiracy. Any statements in furtherance of Boyd's murder, either before, during, or after the fact, are necessarily in furtherance of the underlying drug trafficking conspiracy.

Finally, the statements of the defendant and the individuals he is speaking with in the Missouri Department of Corrections in November and December of 2019 and the statements of the defendant and the individuals he is speaking while incarcerated at the St. Charles County Detention Center are made to pass information from the defendant to another co-conspirator to protect and further the conspiracy or the defendant's admission to criminal behavior.

The statements the Government will offer as trial evidence were "designed to promote or facilitate achievement of the goals of the ongoing conspiracy."   As a result, they were made "in furtherance of the conspiracy" and should be admitted.  *See generally United States v. Frazier*, 280 F.3d 835, 849 (8th Cir. 2002) ("Co-conspirator statements are properly admitted if the Government proves by a preponderance of the evidence that (1) a conspiracy existed; (2) both the declarant and the defendant were members of the conspiracy; and (3) the declarant made the statement during the course and in furtherance of the conspiracy."); *United States v. Arias*, 252

23

F.3d 973, (8th Cir. 2001) ("For statements to be admissible, it is not necessary that the declarant either be a charged member of the conspiracy or that the declarant be identifiable so long as the statement itself proves reliable."); *United States v. Smith*, 909 F.2d 1164, 1167 (8th Cir. 1990) (holding that a recordings of wiretap phone conversations were admissible against the defendant under Rule 801(d)(2)(E)).

## C. Audio Recordings and Transcripts

The Government will introduce recordings of telephone conversations intercepted pursuant to court-ordered wiretaps, and recorded jail telephone conversations..

### 1. *Excerpt Calls/Recordings*

While many of the wiretap tapes and consensual recordings to be offered by the Government are audible, they are voluminous in the number of criminal conversations they contain and there are some portions of the calls which are inaudible.   Consequently, excerpts of the calls and meetings containing representative examples of the criminal conversations will be offered. Such excerpts and summary testimony about the same are appropriate.   Fed. R. Evid. 1006; *United States v. Segines*, 17 F.3d 847 (6th Cir. 1994); *United States v. Denton*, 556 F.2d 811, 815-16 (6th Cir. 1977) and cases cited therein.   *See* 5, WEINSTEIN'S EVIDENCE, p. 1006(06).

### 2. *Authenticity of Recordings*

The Eighth Circuit in *United States v. McMillan*, 508 F.2d 101, 104 (8th Cir. 1974) set forth a *prima facie* test to establish the authenticity of electronic surveillance.   This prima facie test includes seven foundation guidelines, where the Government must show that:

> (1) That the recording device was capable of taking the conversation now offered in evidence.
> (2) That the operator of the device was competent to operate the device.
> (3) That the recording is authentic and correct.
> (4) That changes, additions or deletions have not been made in the recording.

      (5) That the recording has been preserved in a manner that is shown to the court.
      (6) That the speakers are identified.
      (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id.* The elements of this test are not rigid, but applied with flexibility based on common sense. *United States v. Webster*, 84 F.3d 1056, 1064 (8th Cir. 1996); *United States v. Roach*, 28 F.3d 729, 733 (8th Cir. 1994). In *United States v. Scully*, 546 F.2d 255, 269 (9th Cir. 1976), the court dealt with the question of whether the Government could make its *prima facie* authenticity showing without producing all of the monitoring agents. In this decision, the court held that this was permissible when agents with knowledge of the surveillance testified. *Id.*

### 3. *Use of Transcripts*

The Government plans to introduce transcripts of all of the audible conversations played. In the Eighth Circuit, the decision to allow the use of transcripts to assist jurors in listening to a tape recording lies within the sound discretion of the district judge. *United States v. Chavez-Alvarez*, 594 F.3d 1062, 1069 (8th Cir. 2010); *see also United States v. Placencia*, 352 F.3d 1157, 1165 (8th Cir. 2003) (noting trial court's discretion to admit transcripts of foreign language transcripts even without tape recordings). Transcripts in the jury room will generally not be considered cumulative when they assist the jury in evaluating the evidence. *Id*. at 1069.

The use of transcripts aids the jury in a number of ways. First, transcripts help the jurors follow often poor-quality recordings. *United States v. Riascos*, 944 F.2d 442, 443 (8th Cir. 1991). These transcripts also help the jurors identify speakers. *United States v. Henneberry*, 719 F.2d 941, 949 (8th Cir. 1983). Additionally, transcripts assist the jury when portions of the recording are inaudible. *United States v. Willis*, 774 F.2d 258, 259 (8th Cir. 1985). Finally, transcripts also aid the jury in understanding colloquialisms in the conversation. *United States v. Delpit*, 94 F.3d

1134, 1148 (8th Cir. 1996).   Because each of these considerations apply in the case at bar, the jury should be allowed access to the transcripts of all conversations played.

The trial court should allow the use of transcripts only after each party has had an opportunity to verify the accuracy of the recordings and provide their own transcript.   *United States v. Britton*, 68 F.3d 262, 264 (8th Cir. 1995).   Foundationally, this could be the person who prepared the contents.   *United States v. Bentley*, 706 F.2d 1498, 1507 (8th Cir. 1983); *United States v. Frazier*, 280 F.3d 835, 849 (8th Cir. 2002).   However, the Eighth Circuit does not mandate that the foundation for the transcripts be laid by the person who prepared the transcripts, but it may be established by a person who was a party to the conversations.   *United States v. Gordon*, 688 F.2d 42, 44 (8th Cir. 1982); *Frazier*, 280 F.3d at 849-50.

The Court must instruct the jury that differences in meaning may be caused by such factors as the inflection in a speaker's voice or inaccuracies in the transcript and that "any discrepancies [from the transcript] should be resolved in favor of what they heard on the tapes."   *United States v. Scott*, 243 F.3d 1103, 1107 (8th Cir. 2001).   However, once admitted into evidence and given the proper cautionary instruction, the transcripts may be used by the jury in their deliberations. *United States v. Foster*, 815 F.2d 1200, 1203 (8th Cir. 1987); *Chavez- Alvarez*, 594 F.3d at 1069.

### 4. *Joint Presentation of Audio and Transcripts*

The Government intends to play the audio of telephone calls while a rolling transcript of the call appears on the court monitors.   There will be a highlighted portion of text rolling and synched to the audio file.   This is an aid to assist the jury in identifying the speakers and following the conversation.

### 5.      *Interpretation of Recordings*

After the above recordings are played, the Government intends to ask the witness to summarize and/or interpret the conversations, many of which contain coded language.   The witnesses will have extensive experience in drug investigations and knowledge of the conspiracy's structure and organization.

Federal Rule of Evidence 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The witnesses have, by virtue of their "skill, experience, [and] training" acquired "specialized knowledge" as to the business transactions of the defendant that will "help the trier of fact to understand the evidence." Fed. R. Evid. 702.   This information is "based on sufficient facts or data," and "is the product of reliable principles and methods" such as other law enforcement sources, informant de-briefings, recorded conversations, and interviews.   Moreover, the witnesses "have reliably applied the principles and methods to the facts of the case."   Under these circumstances, Fed. R. Evid. 702 provides that such a witness should be permitted to "testify in the form of an opinion or otherwise."

"It is well established that experts may help the jury with the meaning of jargon and code words." *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996). The Eighth Circuit has stated that "[t]here is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis." *Id.*; *see also United States v. Farmer*, 543 F.3d 363, 370 (7th Cir. 2008) ("[N]arcotics code words are an appropriate subject for expert testimony, and [ ] law enforcement officers who have training and experience in drug-related transactions and crimes are qualified to testify as an expert concerning the practices of people engaged in that type of conduct"); *United States v. Tocco*, 200 F.3d 401, 419 (2d Cir. 2000) ("[E]vidence regarding the inner-workings of organized crime has been held to be a proper subject of expert opinion because such matters are 'generally beyond the understanding of the average layman.'").

The Eighth Circuit Court of Appeals has explicitly held that "[l]aw enforcement officers may testify as experts concerning the modus operandi of drug dealers as such activities are not something with which most jurors would be familiar. Significantly, the Eighth Circuit has held that experts may help the jury with the meaning of jargon and code words." *United States v. Placensia*, 352 F.3d 1157, 1164-65 (8th Cir. 2003) (citing *United States v. Brown*, 110 F.3d 605, 610 (8th Cir. 1997)); *Delpit*, 94 F.3d at 1145.   Under this Court's decisions in *Delpit* and *Placensia*, the case agent is authorized to interpret all of the "drug dealers' cryptic slang," not merely "common drug terminology."   *Delpit*, 94 F.3d at 1145.   Interpretation testimony is allowed where "the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding the business of drug trafficking." *United States v. Robertson*, 387 F.3d 702, 704 (8th Cir. 2004).   This broad standard will encompass the case agent's testimony in this case.

28

### D.  **Self-Authenticating Documents - Public Documents and Business Records**

The Government provided initial notice on September 21, 2023 that it will seek the admission of certain business and governmental records pursuant to Rule 902 of the Federal Rules of Evidence. *See* ECF Doc. #80.   Copies of the records were provided during discovery prior to or on September 21, 2023.

"Fed.R.Evid. 803(b) permits admission into evidence of 'records of regularly conducted activity.'" *Shelton v. Consumer Products Safety Comm'n*, 277 F.3d 998, 1009 (8th Cir. 2002), *cert. denied*, 537 U.S. 1000 (2002). Furthermore, Fed.R.Evid. 902 permits public records to be admitted with no extrinsic evidence of authenticity such as domestic public documents that are sealed signed, or certified or certified copies of public records. See Fed.R.Evid. 902(1),(2), and (4). Further, Fed.R.Evid. 902 also permits business records and records or data generated by an electronic system or copied from an electronic system to be introduced without the testimony of a custodian of records so long as a certificate accompanying the records certifies that it was: (1) made at or near the time of the occurrence by a person with knowledge; (2) kept in the course of the regularly conducted activity; and (3) made by the regularly conducted activity as a regular practice. The record and the declaration must be made available to the defendants for inspection. Fed.R.Evid. 902(11),(13), and (14); *Shelton*, 277 F.3d at 1009 n. 9.   Further, many of the documents offered in evidence may be photocopies rather than originals. Such copies are admissible under Federal Rule of Evidence 1003 unless there is a genuine dispute as to the authenticity of the document.

The following is a list of Records the Government seeks to admit under Fed. R. Evid. 902:

1.      Judgment and Indictment in *State of Missouri v. Freeman Whitfield*, 1622-CR-02681-01.

2.      Judgment and Indictment in *State of Missouri v. Freeman Whitfield*, 1622-CR-04592-01.

3.      Indictment in *United States v. Goolsby et al*, 4:19-CR-00412 AGF.

4.      State of Missouri Death Certification of Antonio Boyd.

5.      State of Missouri Death Certification of Larry Pitchford.

6.      Subscription Information and Cellular Call Records for Talisha Nabors's cellular telephone with number (314) 930-0096.

7.      Call Details with Cell Sites, Subscriber Information, Timing Advance records, and other cellular records for (774) 356-1103.

8.      A CDR Summary Report of Calls in 2 pages and 39 recorded telephone conversations recorded by the Missouri Department of Corrections (MDC) between (774) 356-1103 and inmates in MDC facilities.

9.      3 Calls between the defendant confined in St. Charles County Department of Corrections (SCCDOC) and other persons recorded by the SCCDOC on May 4, 2021.

10.     2 videos and 3 screenshots from a video camera system in the lobby and entry area of 1136 Washington Avenue, St. Louis, Missouri by Watch Tower Security Inc. on March 13, and March 17, 2018.

11.     2 videos and 8 screenshots from videos recorded by a camera at the intersection of Chestnut Street and North 7th Street in downtown St. Louis, Missouri by the St. Louis Metropolitan Police Department Real Time Crime Center (SLMPD-RTCC) on April 20, 2018 and July 20, 2018.

Each of the above records properly comports with the specific part of Rule 902 applicable to that record.  The indictments and records from the Circuit Court for the 22nd Judicial Circuit and the United States District Court are domestic public documents that are seal and signed or signed and certified, or certified copies of public records and admissible under Rule 902(1), (2), and/or (4).  The cellular telephone records for (314) 930-0096 and (774) 356-1103 are certified domestic records of regularly conducted activity, certified records generated by an electronic process or system, and/or certified data copied from an electronic device, storage medium, or file

30

by Sprint/T-Mobile and are admissible under 902(11), 902(13), and/or 902(14).   Likewise, the recorded jail calls from the MDC and SCCDOC are certified domestic records of regularly conducted activity, certified records generated by an electronic process or system, and/or certified data copied from an electronic device, storage medium, or file by the correctional facilities and are admissible under 902(11), 902(13), and/or 902(14).   Finally, the video recordings and screenshots from the lobby of 1136 Washington Avenue and the downtown intersection are certified domestic records of regularly conducted activity, certified records generated by an electronic process or system, and/or certified data copied from an electronic device, storage medium, or file by Water Tower Security and SLMPD-RTCC and are admissible under 902(11), 902(13), and/or 902(14).

### E.  Evidence Admissible Pursuant to Fed. R. Evid 401 and 403

The Government seeks to admit certain evidence pursuant to Fed. R. Evid. 401 and 403. This includes one of the aforementioned self-authenticating documents pursuant to Fed. R. Evid. 902 (victim Boyd's federal indictment, as described in detail below).   To the extent the defendant objects to the admissibility of this evidence, the Government highlights some of this evidence for the Court, as well as the applicable case law.

Fed. R. Evid. 401 allows for the admission of evidence that has any tendency to make a fact of consequence more or less probable than it would be without the evidence.   Rule 403 provides, moreover, that relevant evidence may be excluded only if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and/or needlessly presenting cumulative evidence.   The United States Supreme Court has held that that unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

### 1. *Certified Copy of Federal Indictment in United States v. Goolsby et al, 4:19-CR-00412-AGF is Admissible*

The Government intends to admit a certified copy of the federal indictment charging Antonio Boyd, Guy Goolsby, and others, with a drug trafficking conspiracy.   This certified copy is admissible pursuant to Fed. R. Evid. 902.   Moreover, it is relevant and admissible pursuant to Fed. R. Evid 401 and 403.

That fact that Boyd and Goolsby were facing federal criminal charges at the time of Boyd's murder is a fact of consequence because it ties directly to the Government's theory of the defendant's guilt.   As the Government has made clear, the defendant is alleged to have murdered Boyd in response to the latter's cooperation against Goolsby, the defendant, Green, and other co-conspirators, charged and uncharged.   A certified copy of Boyd's federal indictment would thus directly make this fact more probable under Rule 401.   The Government will present evidence that Boyd cooperated, and this fact along with his underlying criminal case motivated the defendant to silence Boyd to end the threat to the members of the conspiracy being prosecuted at the time, and ending the threat to the defendant himself, Green and the still ongoing conspiracy.

Fed. R. Evid 403, furthermore, does not prohibit the introduction of this evidence. The evidence is highly probative and integral to the Government's case, and it presents no danger of unfair prejudice, confusing the issues, or misleading the jury.   Moreover, the defendant is charged with his involvement in the exact same conspiracy of his indictment that Goolsby was charged with in his.   Both charging documents cover the same conspiracy, with the only difference being Whitfield's continuing involvement in the conspiracy extending beyond those charged in *Goolsby et al*, 4:19-CR-00412-AGF.

The *Goolsby* indictment does not imply that any of the charged co-conspirators have been adjudged guilty of anything, have pleaded guilty, or been convicted. Moreover, the Eighth Circuit Manual of Model Jury Instructions have an instruction directly on point in this regard, which instructs the jury that an indictment is not evidence of guilt and is simply the document that formally charges the defendants with the crimes. *See* Eighth Circuit Manual of Model Jury Instructions 3.06. The Indictment charging Boyd and Goolsby, et al, is thus not evidence of their guilt, much less the defendant's, but rather simply evidence that the Indictment itself exists.

Finally, presenting Boyd's indictment also presents no danger of undue delay, waste of time, or needless presentation of cumulative evidence, as it is a self-authenticating record under Fed. R. Evid. 902.

### 2.   *Crime Scene Photographs are Admissible*

The Government intends to admit photographs of the crime scene, including several photographs depicting Boyd at the scene and his multiple gunshot wounds. The photographs corroborate the testimony of witnesses at the scene, and they will be used as aids for the medical examiner's testimony in order to explain the nature and extent of Boyd's injuries, as well as the cause of death.

Under Federal Rule of Evidence 403, "a district court may admit relevant photographs unless they are 'so gruesome or inflammatory that [the] prejudicial impact substantially outweigh[s] [the] probative value.' *United States v. Greatwalker*, 356 F.3d 908, 912 (8th Cir. 2004) (quoting *United States v. Ingle*, 157 F.3d 1147, 1153 (8th Cir. 1998)). The Eighth Circuit has found that photographs and/or videotapes of a crime scene are admissible, even when graphic, when they show how the crimes were committed or if they tend to link a defendant to the murder. *United States v. Standish*, 3 F.3d 1207, 1209-10 (8th Cir. 1993) (*see also United States v. Ortiz*,

315 F.3d 873, 897 (8th Cir. 2002) ("The photographs at issue here show the victim's bloody corpse and are graphic. However, they also have significant probative value").

These photographs are relevant and admissible, and are not excludable under Fed. R. Evid. 403.   The crime scene photographs are directly relevant to establishing how, when, and where Boyd died, the corroborate witness testimony, and other physical evidence at the scene and they are not unfairly prejudicial nor would they run the risk of inflaming the jury. While the images are graphic in what they depict, they are not particularly gruesome and are appropriate for the jury to view given the nature of the charges.   Moreover, the crime scene photographs are not cumulative or duplicative of each other. The photographs are highly relevant and their probative value is not substantially outweighed by any risk of unfair prejudice. The Eighth Circuit has routinely rejected arguments to the contrary in similar contexts.   *United States v. Greatwalker*, 356 F.3d 908, 912–13 (8th Cir. 2004); *United States v. Ortiz*, 315 F.3d 873, 897 (8th Cir. 2002); *United States v. Ingle*, 157 F.3d 1147, 1153 (8th Cir. 1998); *United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997); *United States v. Standish*, 3 F.3d 1207, 108, 1210 (8th Cir. 1993); *United States v. Petary*, 857 F.2d 458, 463 (8th Cir. 1988).

**F.  9-1-1 Call is Admissible as an Excited Utterance Pursuant to Fed. R. Evid. 803(2).**

Out of court statements offered to prove the truth of the matter asserted are generally considered inadmissible hearsay evidence. *See* Fed. R. Evid. 801, 802.   Excited utterances are excepted from this general rule.   *See* Fed. R. Evid. 803(2); *See also United States v. Bercier*, 506 F.3d 625, 630 (8th Cir. 2007).   Federal Rule of Evidence 803(2) defines an "excited utterance" as "a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."   "The rationale behind this particular exception 'derives from the teaching of experience that the stress of nervous excitement or physical shock stills the reflective

34

faculties, thus removing an impediment to truthfulness.'" *Brunsting v. Lutsen Mtns. Corp.*, 601 F.3d 813, 817 (8th Cir. 2010) (quoting *United States v. Sewell*, 90 F.3d 326, 327 (8th Cir.1996)). "In other words, statements made by a declarant while that declarant remains under the stress or shock of an event retains a 'guarantee of trustworthiness' that is not present when the declarant has the opportunity for reflection and deliberation." *United States v. Graves*, 756 F.3d 602, 604-05 (8th Cir. 2014) (quoting *Miller v. Keating*, 754 F.2d 507, 510 (3d Cir. 1985)). So for this exception to apply, the declarant's condition at the time she makes the statement must be of such a nature that "the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010) (quoting *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir.1980)).

In determining whether a declarant is still under the stress of excitement when the statement was made, the Eight Circuit has held that courts are to consider "the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement." *United States v. Rice*, 423 F. App'x 653, 656 (8th Cir. 2011).

For a statement to "relate" to the startling event or condition, courts are to afford a broad scope. *See* Fed. R. Evid. 803(2), Adv. Comm. N. ("Permissible *subject matter* of the statement is limited under . . . [paragraph] (1) to description or explanation of the event or condition . . . In Exception [paragraph] (2), however, the statement need only 'relate' to the startling event or condition, thus affording a broader scope of subject matter coverage"). Additionally, according to McCormick on Evidence, "Federal Rule 803(2) and other modern formulations of the exception require a connection between the event and the content of the statement, but define that connection

35

broadly as "relating to" the event. This terminology is intended to extend beyond merely a description or an explanation of the event. The courts have been quite liberal in applying this requirement." § 272. Excited utterances, 2 McCormick On Evid. § 272 (8th ed.)

Ms. Queen's statements during her 9-1-1 call to the emergency dispatch operator satisfies the requirements of Fed. R. Evid. 803(2), and are admissible as excited utterances.   This is readily apparent given the nature and context of the phone call.  Ms. Queen was in immense distress having just heard the gun shots and having subsequently found her twenty-plus year paramour and fiancé, Boyd, mortally wounded, profusely bleeding, and succumbing to his injuries on the sidewalk in front of her home. During the call, Ms. Queen was crying and screaming, and the dispatch operator had difficulty in communicating with her throughout the call.   Further, as the dispatcher is attempting to obtain important information to dispatch an appropriate response, it appears that Boyd expires in front of Ms. Queen.   Also, adding to the startling/excited state, was the fact that Ms. Queen was surrounded by Boyd's daughter and her daughter, who were also in distress and screaming.   While communicating with the operator in this distressed state, Ms. Queen blurted out to the dispatcher that Boyd had a case and was going to testify against somebody, declaring a reason for his untimely murder and the motive behind it.   This utterance was not in response to a question by the dispatcher, nor was the dispatcher seeking any information about the cause of the shooting or the perpetrator.

Rule 803(2), and the Eighth Circuit cases interpreting it, simply requires (1) a startling event or condition, (2) a statement relating to the startling event or condition, and (3) the declarant to still be under the shock/excitement of the startling event or condition at the time she makes the statement. Boyd's sudden and violent death, and Ms. Queen observing him during and in the immediate aftermath, categorically qualifies as a startling event or condition.   Ms. Queen, as is

evident in her demeanor, is undeniably under the shock or excitement of this traumatic event.   The statement occurred a couple of minutes after she heard the shooting and was still in the process of watching Boyd expire. She was clearly emotionally distraught. Finally, the statement clearly related to the underlying condition/event.   She states that he was going to testify while simultaneously describing him having just been shot and killed. She clearly linked the two and viewed them as related and made the unprompted disclosure in her excited state.   These statements certainly fall within the broad construction of this exception to the rule against hearsay. They were spontaneous, excited, and impulsive, rather than the product of deliberation or calculated reflection, and are admissible under 803(2).

### G.  Intrinsic Evidence and Evidence Offered Pursuant to Fed. R. Evid. 404(b)

#### 1.    *Intrinsic Evidence*

As detailed above in Section II, the vast majority of the evidence is intrinsic to the charges in the indictment, including distribution of fentanyl, possession of fentanyl, possession of firearms and ammunition, and possession of cell phones, drug proceeds, body armor, scales, and other drug paraphernalia.   As detailed above, the conversations between the defendant and Goolsby, the defendant and Griffin, the defendant and inmates at MDC, and the defendant while he was incarcerated at SCCDC contain statements made to further the conspiracy and include admissions by the defendant and other co-conspirators made to promote the actions of the conspiracy and/or to protect the conspiracy and co-conspirators from law enforcement intervention.   Should the Court determine any of the evidence is not intrinsic, the Government will move to admit the evidence pursuant to Federal Rule of Evidence 404(b), subject to the development of the record.

### 2.    *Evidence of Prior State Drug Convictions*

It is well-settled that "Rule 404(b) prohibits the admission of other bad acts evidence that are offered to prove the character of a person in order to show action in conformity therewith." *United States v. Hill*, 638 F.3d 589, 592 (8th Cir. 2011) (internal quotations omitted).   "This evidence may be admissible, however, for other purposes, including to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'"   *United States v. Turner*, 781 F.3d 374, 389 (8th Cir. 2015).   This Court routinely instructs that Rule 404(b) is "one of inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination."   *United States v. Wilson*, 619 F.3d 787, 791 (8th Cir. 2010) (quoting *United States v. Littlewind*, 595 F.3d 876, 881 (8th Cir. 2010)); *United States v. Cowling*, 648 F.3d 690, 699 (8th Cir. 2011) (same).

Rule 404(b) provides in applicable part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...

Fed. R. Evid. 404(b).

In *Huddleston v. United States*, 485 U.S. 681 (1988), the Supreme Court adopted an inclusive approach to evaluating the admissibility of Rule 404(b) evidence.   The *Huddleston* Court found that in enacting Rule 404(b), "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was *with ensuring that restrictions would not be placed on the admission of such evidence.*" *Id*. at 688-89. (Emphasis supplied.) Echoing *Huddleston*, this Court routinely instructs that Rule 404(b) is "one of inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination." *United*

38

*States v. Wilson*, 619 F.3d 787, 791 (8th Cir. 2010) (quoting *United States v. Littlewind*, 595 F.3d 876, 881 (8th Cir. 2010)). *See, e.g., United States v. Cowling*, 648 F.3d 690, 699 (8th Cir. 2011) (same); *United States v. Thomas*, 593 F.3d 752, 757 (8th Cir. 2010) (same); *United States v. Koski,* 424 F.3d 812, 817 (8th Cir. 2005) (Rule 404(b) is rule of inclusion, rather than exclusion, which allows the admission of other crimes evidence relevant to any issue in the trial other than the criminal disposition of the defendant).

Rule 404(b) evidence is admissible if it is: (1) relevant to a material issue; (2) similar in kind and not overly remote in time to the crime charged; (3) supported by sufficient evidence and (4) higher in probative value than prejudicial effect. *United States v. Gant*, 721 F.3d 505, 509 (8th Cir. 2013).  Evidence of the defendant's convictions for distribution and sale of an opiate and possession of a firearm while doing so are admissible to prove the defendant's intent, knowledge, absence of mistake, and lack of accident in conspiring to distribute and possess with intent to distribute fentanyl in early 2019 and on May 4, 2021, and his use and possession of firearms to further his drug trafficking on December 9, 2019, and May 4, 2021.

> i.)   The defendant's 2017 prior felony convictions and the basic underlying facts are relevant to show his knowledge of, intent to be involved, and the absence of his mistakenly or accidently becoming involved in the drug distribution conspiracy and possession of firearms to further those drug crimes.

Where, as here, the defendant presents a general denial defense and has therefore necessarily placed his state of mind at issue, his prior felony drug convictions are relevant to show intent and knowledge.  *United States v. Banks*, 706 F.3d 901, 907 (8th Cir. 2013).[1]  In drug

---

1       At the present time, other than the defendant generally denying that he committed the crimes charged, the Government does not know what specific defense strategy the defendant will employ or the arguments he will make. However, based on the facts, it seems the defendant will argue that although he may know or have been with co-conspirators, he will argue that he was not part of the conspiracy and that anyone who states differently is either lying about his involvement or mistaken as to what they observed.   In essence, it is believed that the defendant will argue

prosecutions, courts routinely admit evidence of prior drug activity or convictions for such crimes as possession or sale of controlled substances.   *See, e.g., United States v. Thomas*, 398 F.3d 1058, 1062-63 (8th Cir. 2005) (defendant's two prior convictions for distributing crack in prosecution for possession with intent to distribute were admissible to show intent);   *Banks*, 706 F.3d at 906 (admission of prior conviction for possession of marijuana in prosecution for conspiracy to possess controlled substance with intent to distribute to show knowledge and intent); *United States v. Franklin*, 250 F.3d 653, 658 (8th Cir. 2001) (admission of guilty plea for possession of cocaine base admissible in prosecution for possession with intent to distribute cocaine base, cocaine, and heroin to prove knowledge and intent); *United States v. Fang*, 844 F.3d 775, 780-81 (8th Cir. 2016) (admission of two prior convictions for possession of methamphetamine admissible to show knowledge in prosecution for possession with intent to distribute); *United States v. Monds*, 945 F.3d 1049, 1052-53 (8th Cir. 2012) (admission of three prior felony drug convictions in prosecution for possession with intent to distribute cocaine base to show knowledge and intent); *United States v. Horton*, 756 F.3d 569, 579 (8th Cir.) *cert. denied*, 135 S. Ct. 122, 190 L. Ed. 2d 93 (2014) (internal citations and quotations omitted) (evidence of prior possession of drugs is admissible to show such things as knowledge and intent of a defendant charged with a crime in which intent to distribute drugs is an element.).   When prior convictions are admitted for the purposes of demonstrating knowledge or intent, they "need not be duplicates" of the current charge, but only "sufficiently similar to support an inference of criminal intent."   *Thomas*, 398

---

he was merely present at the scene of one or more events that took place to further the conspiracy, he had no intent to be part or knowledge of the of the conspiracy, and any involvement on his part was mistaken or accidental. Accordingly, the defendant's prior convictions sale/distribution of heroin/fentanyl are extremely probative to the defendant's knowledge of the conspiracy's existence, to his intent to be part of the conspiracy, and to establishing he did not mistakenly or accidently join the conspiracy in this case.

F.3d at 1063 (internal quotations omitted).

Applying this standard, the Eighth Circuit has consistently held that "evidence of prior possession of drugs, even in an amount consistent with only personal use, is admissible . . . [against] a defendant charged with a crime in which intent to distribute drugs is an element." *Franklin*, 250 at 658 (internal quotations omitted), *United States v. Hardy*, 224 F.3d 752, 757 (8th Cir. 2000), *Unites States v. Logan*, 121 F.3d 1172, 1178 (8th Cir. 1997).   This defendant's convictions are more than possession of drugs for personal use.   His convictions are for the distribution and sale of opiates and for possession of a firearm while possessing an opiate, and mirror his present charges of conspiracy to distribute, possessing with intent to distribute, and possessing firearms to further those drug crimes.   Even if the defendant attempts to argue he was merely present with other co-conspirators, did not know the conspiracy was operating around him, or mistakenly became involved in it by traveling with other co-conspirators, his prior 2017 distributions and his conviction show the defendant has knowledge of how drug conspiracies operate, including those involving opiates, and that drug distributors are commonly armed to protect their distribution activities.   The defendant knows what distribution amounts of opiates, like heroin and fentanyl, look like, he knows how those drugs are packaged for street-level sale, and he knows that firearms are used and possessed to protect the drug distribution.   In essence, the defendant's 2017 convictions are directly relevant to his knowledge, his intent, and the absence of mistakenly or accidently engaging in his presently charged conspiracy to distribute heroin/fentanyl and his possession of fentanyl.

ii.)   <u>The defendant's 2017 priors and their basic underlying facts from 2016 are<br>not overly remote in time to the 2018 to 2021 crimes charged in this case.</u>

This Court applies a reasonableness standard and examines the facts and circumstances of

41

each case to determine if Rule 404(b) evidence is too remote,   *United States v. Strong*, 415 F.3d 902, 905 (8th Cir. 2005), and there is no fixed period during which the prior acts must have occurred. *United States v. Baker*, 82 F.3d 273, 276 (8th Cir. 1996).

Similarly, this Court has approved periods of eighteen years, where defendant was incarcerated for ten years of intervening period, *United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006) (sixteen years), *Strong,* 415 F.3d at 906 (fifteen years prior to charged conduct and where defendant's intervening years in custody undercut his challenge to temporal remoteness); *United States v. James*, 564 F.3d 960, 963 (8th Cir. 2009) (fifteen years before trial and ten years prior to charged conduct); *United States v. Yielding*, 657 F.3d 688, 702 (8th Cir. 2011) (ten years prior to charged conduct); *United States v. Ellis,* 817 F.3d 570 (8th Cir. 2016) (nineteen year old conviction for possession of heroin with intent to deliver was admissible when defendant was incarcerated for much of the time), *Banks*, 706 F.3d at 906-07. *But see United States v. Aldridge*, 664 F.3d 705, 713-15 (8th Cir. 2011) (while twelve-year-old and five-year-old convictions were admissible, it was harmless error to admit nineteen and twenty-year-old convictions).

In the instant case, the defendant's convictions for sale, distribution and possession of weapon while possessing an opiate occurred in May of 2017, less than a year before the specifically enumerated time frame of the conspiracy in the indictment of March of 2018 to May of 2021.   The direct evidence of the defendant's involvement in the conspiracy began less than a year after that in early 2019 and continued up through his arrest in May of 2021.   Further, the prior criminal acts associated with his prior convictions in June of 2016 were only 11 months before he was convicted of those prior crimes.   "[T]here is no absolute rule for the number of years that can separate evidence of offenses admitted under Rule 404(b). Instead [the Court] examine[s] the facts and circumstances of each case and appl[ies] a reasonableness standard."   *Thomas*, 398 F.3d at 1063).

In determining whether the prior convictions are impermissibly remote, the Court should consider "the similarities between [the] prior convictions and the current offense." *Id*.

More recently, in *United States v. Michael Grady,* 4:15 CR 404 HEA (Doc. 3100) (March 10, 2021), another United States District Judge in this District concluded that a defendant's prior conviction for conspiracy to distribute heroin was admissible as 404(b) evidence in a trial where the defendant faced similar charges. The court explained that,

> As to the sufficiently similar factor, the conspiracy conviction is sufficiently similar to the charges herein. Both the prior conviction and the current charges center around drug distribution. Defendant's knowledge of drug distribution from the prior conspiracy support an inference of Defendant's intent to conspire in another drug trafficking operation.

Doc. 3100, p. 7.

In the instant case, the defendant criminal actions in his prior convictions and the present case are very close in time.   In fact, direct evidence of his criminal behavior in this case is within a couple of years from his convictions and all of his criminal activity in this case (which spans 2019, 2020, and 2021) is less than 5 years from his prior criminal actions.   Second, the defendant's criminal drug distribution and weapons possession in the prior convictions and the instant case are extremely similar.   In this case, the defendant is charged with distributing opiates to drug customers/users in 2019 through 2021 while often armed with a weapon to protect those distribution activities.   In the prior cases, the defendant distributed opiates to an individual posing as a drug customer/user while armed with a weapon.   The defendant's convictions and the criminal conduct that led to those convictions are similar in kind and not too remote in time.

iii.)   <u>The prior convictions and their basic underlying facts are supported by ample evidence.</u>

The defendant's prior criminal behavior and his conviction also meet the third element of

43

the Rule 404(b) analysis because they are supported by sufficient evidence.   Under Rule 404(b), the Government must prove the prior convictions by "a preponderance of the evidence." *United States v. Vega*, 676 F.3d 708, 719 (8th Cir. 2012).   Further, the Government's burden will be met if the Government also offers a certified copy of the defendant's conviction.   *See United States v. Strong*, 415 F.3d 902, 906 (8th Cir. 2005) (holding that the government provided sufficient evidence of the defendant's prior convictions where a special agent identified certified copies of the convictions).

In this case, the Government intends to introduce certified copies of the Judgement, which includes the defendant's guilty plea, and the Indictment in each of the prior convictions. *See* Attachments 1 and 2.   These self-authenticating documents establish the defendant admitted that he sold/distributed heroin to another person on June 6, June 9, and June 16, 2016. *Id.*   Further, the Judgement and Indictment establish that on June 16, 2016, he "knowingly possessed a .45 caliber semi-automatic pistol, a firearm, while [he] was in possession of heroin." Attachment #2, Indictment, pg. 2.   The Government's evidence will easily and plainly establish by a preponderance of the evidence the defendant's sale/distribution of heroin to another person three times in June of 2016, his guilty pleas to those sales/distributions on May 22, 2017, and his convictions for those charges.

      iv.)  <u>The probative similarity of the prior convictions, the similarity of its facts, and the anticipated cautionary jury instruction outweigh the risk of unfair prejudice to the defendant.</u>

While damaging evidence is always prejudicial, the issue with respect to Rule 404(b) evidence is whether it is <u>unfairly</u> prejudicial.   *Gant*, 721 F.3d at 510.   The Eighth Circuit Court of Appeals affords great deference to the district court's weighing of the probative value of the evidence against its prejudicial effect.   *Id.*   And looks to such criteria as relevance, remoteness

and substantive similarity of the crimes to determine whether unfair prejudice exists.  *See, e.g.,*
*Banks*, 706 F.3d at 907.   The potential for unfair prejudice is reduced where the district court gives
a limiting instruction which instructs the jury to consider this evidence only as it relates to the
permissible issues of knowledge, intent, motive, lack of accident, or absence of mistake.  *Id.;*
*United States v. Gaddy*, 532 F.3d 783, 790 (8th Cir. 2008).

As demonstrated above, the defendant's prior convictions and the underlying criminal
behavior are incredibly probative as to his knowledge of this heroin/fentanyl distribution
conspiracy, his intent to be involved in this conspiracy, and the absence of mistakenly or accidently
becoming involved in this conspiracy.   His prior convictions and the very limited facts as detailed
in the state indictments are not too remote in time and detailed much of the proffered criminal
behavior the defendant engaged in this case.   Further, the Government will propose a cautionary
jury instruction modeled on instruction 2.08 of 8th Circuit Manual of Model Jury Instructions to
ensure the jury may only consider this evidence to evaluate whether defendant had intent,
knowledge, motive, and/or absence of mistake in voluntarily joining or participating in the charged
conspiracy to distribute or possess with the intent to distribute fentanyl.   The prior convictions,
their limited underlying facts, and evidence of both are not unfairly prejudicial and are admissible
under Rule 404(b).

### H.  Expert Testimony Pursuant to Fed. R. Evid. 702.

The Government intends to call numerous expert witnesses in its case-in-chief, including
a Medical Examiner to render a professional medical opinion as to cause of death, two firearms
examiners for ballistic and cartridge casings comparison and firearm identification and interstate
nexus, two chemical analysts for controlled substance identification, a latent fingerprints examiner
and a DNA analyst.   It is well settled, expert testimony by qualified individuals in these areas is

45

admissible under Federal Rule of Evidence 702, which states a qualified witness may testify as an expert, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.   To assist the jury in understanding complicated scientific, technical and specialized matters, medical examiners, firearms experts, and drug, fingerprint, and DNA analysts have testified in innumerable jury trials for many years. Further, Fed. R. Evid. 702, permits the Government to call a qualified expert in drug trafficking patters and drug distribution and an expert in analysis of historical cellular data for geo-locations purposes.

### 1.    *Drug Trafficking Pattern Expert Witness Testimony*

At trial, the Government plans to introduce the expert opinion testimony of Investigator Edward Clay and other law enforcement officers regarding the importation, distribution, and "street value" of cocaine, heroin, fentanyl and the modus operandi of individuals who traffic in drugs including typical structures and roles within drug trafficking organizations.   A more detailed explanation of Mr. Clay's anticipated testimony is continued in the Government's First Notice of Expert Testimony Pursuant to Rule 16(a)(1)(G). *See* ECF Doc. #88. This expert testimony will be offered within the parameters of existing Eighth Circuit precedent.

Under Federal Rule of Evidence 702, a qualified witness may testify as an expert, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.   A district court may permit law enforcement officers to give expert testimony concerning the *modus operandi* of drug dealers, because most jurors are not familiar with the trade.   *United States v. Schwarck*, 719 F.3d 921, 923 (8th Cir. 2013);   *United States v. Robertson*, 387 F.3d 702, 704-05 (8th Cir. 2004) ("The business of drug trafficking and the modus operandi of drug dealers are matters unfamiliar to jurors.");

*United States v. Gill*, 513 F.3d 836, 847 (8th Cir. 2008).   Admission of expert testimony or lay opinion testimony is a matter within the broad discretion of the trial judge that will not be disturbed absent an abuse of that discretion.   *United States v. Anderson*, 446 F.3d 870, 874 (8th Cir. 2006); *United States v. Roach*, 644 F.3d 763, 763 (8th Cir. 2011) (advocating standard of "substantial deference").

The Eighth Circuit has repeatedly recognized that Rule 702 permits a district court to allow the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding the business of drug trafficking.   *Robertson*, 387 F.3d at 704 (citing *United States v. Solorio-Tafolla*, 324 F.3d 964, 965 (8th Cir. 2003)) (expert allowed to testify about "(1) the price of drugs in drug trafficking; (2) drug quantities obtained for personal use; (3) drug conspiracies and roles of drug traffickers; (4) how to manufacture methamphetamine; (5) drug investigation and wiretap operations; and (6) the lack of fingerprint evidence on packaging); *Gill*, 513 F.3d at 847 (agent's testimony assisted the jury in understanding "the business of drug trafficking")).

The federal courts as a whole have also routinely permitted law enforcement agents to give expert testimony in a variety of areas concerning drug trafficking.   *United States v. Ham*, 628 F.3d 801, 804 (6th Cir. 2011); *United States v. Urbina*, 431 F.3d 305, 311 (8th Cir. 2005) (practice and knowledge of drug couriers during transport); *United States v. Jeanetta*, 533 F.3d 651, 657 (8th Cir. 2008) (surveillance techniques and use of "innocuous household items" in drug trafficking schemes); *United States v. Jiminez*, 487 F.3d 1140, 1145 (8th Cir. 2007) (pattern of one-way airline tickets not purchased in advance); *Gill*, 513 F.3d 836 at 847 (link between firearms and drug trafficking); *United States v. Spotted Elk*, 548 F.3d 641, 663 (8th Cir. 2008) (typical use of items involved in manufacture like saran wrap, tin foil and grease); *United States v. Beltran-Arce*, 415

47

F.3d 949, 951 (8th Cir. 2005) (typical drug record-keeping procedures); *Solorio-Tafolla*, 324 F.3d at 966 (methods of distribution and manufacture).

In this Circuit, it is well settled that narcotics agents may testify as to the nature, quantity, and street value of drugs, as they relate to the defendant's intent to distribute. *United States v. Kelly*, 679 F.2d 135 (8th Cir. 1982). In addition, agents have been permitted to testify as to the quantity of narcotics being indicative of distribution, *United States v. Robertson*, 387 F.3d 702, 704 (8th Cir. 2004), the typical usage amounts of the narcotic, *Solorio-Tafolla*, 324 F.3d at 965, the nexus between drug trafficking and firearms, *Gill*, 513 F.3d at 847, and the meaning of jargon and code words, *Beltran-Arce*, 415 F.3d at 951; *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996) ("There is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis.").

Because the proposed expert testimony of Mr. Clay (and other law enforcement officers) is relevant, helpful to the jury's understanding of the issue and clearly permissible under the law, it should be allowed.

### 2. *Historical Cell Site Analysis Expert Testimony and Daubert*

The Government also intends to admit evidence concerning the precision location information of the defendant's cellular telephone at the time of the murder. The Government intends to elicit the expert testimony of FBI Special Agent Bastian Freund concerning his analysis of the precision location information data of the defendant's cellular telephone. The Government has provided notice of this expert to the defendant. *See* ECF Doc. #88. To the extent the defendant objects to the admissibility of this evidence, under *Daubert* or for any other reason, the Government has highlighted some of this evidence for the Court in the Facts section, and applicable case law below.

This evidence and associated testimony falls squarely within the parameters of Fed. R. Evid. 702, and is of the type and kind of law enforcement testimony commonly introduced and accepted in criminal cases by federal courts.   A *Daubert* hearing, moreover, is unnecessary given the nature of the testimony and evidence the government is seeking to admit.   Any suggestion otherwise is without merit and should be denied.

Fed. R. Evid. 702 allows a party to introduce expert testimony where that testimony is both relevant and reliable. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).   When the admissibility of expert testimony is challenged, the district court must make "a preliminary determination of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).   The party seeking to introduce the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Fed.R.Evid. 702 states that a witness may offer expert opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon scientific facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Stated another way, the proponent must demonstrate that the expert's opinions are relevant, the expert is qualified to offer them, and "the methodology underlying his conclusions is scientifically valid." *Marmo v. Tyson Fresh Meats, Inc*., 457 F.3d 748, 757-58 (8th Cir. 2006).   Doubts, moreover, should be resolved in favor of admissibility.  *Marmo*, 457 F.3d at 758.  "There is no

requirement that the district court always hold a *Daubert* hearing prior to qualifying an expert witness under Federal Rule of Evidence 702." *United States v. Solorio-Tafolla*, 324 F.3d 964, 965 (8th Cir. 2003).

The Eighth Circuit has repeatedly observed that, as a general rule, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility," but "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." *Lawrey v. Good Samaritan Hosp.*, 751 F.3d 947, 952 (8th Cir. 2014) (internal quotations omitted).

In this case, SA Freund's testimony is admissible under Fed. R. Evid. 702 because his expert opinions are relevant to facts in issue; he is qualified by his extensive specialized training and experience to offer those opinions; his testimony is the product of reliable principles and methods; and the methodology underlying his testimony is sound.   Moreover, any argument concerning technical limitations of historical cell-site analysis, to the extent such arguments are made, apply to the weight of the evidence, not its admissibility.

SA Freund is an expert witness, possessing scientific, technical, or other specialized knowledge, and his testimony will help the trier of fact to understand the evidence or determine a fact in issue. He is a member of the FBI's CAST, and has amassed hundreds of hours of training in cellular networking, radio frequency technology, and historic cellular records interpretation. He also has extensive field experience in analyzing historical cell-site data, and has testified as an expert witness in approximately 32 criminal cases, to include recent testimony in the Eastern District of Missouri.   *See United States v. James Timothy Norman et al*, Case No. 4:20-CR-00418-JAR; *United States v. Jerrell West*, Case No. 4:20-cr-00305-RWS-1; U*nited States v. Michael Grady et al.*, Case No. 4:15-CR-00404-HEA.

50

SA Freund's testimony will clearly assist the trier of fact in understanding the evidence as well as determining one or more facts in issue. State simply, SA Freund's testimony will describe the general location of Defendant's cellular telephone, in an approximate geographical area, (1) in the time leading up to the murder, (2) during the murder itself, and (3) in the time immediately after the murder took place. This testimony will show that Defendant's phone traveled to the vicinity of the murder at the relevant time, and immediately left the area once the murder took place.

SA Freund's testimony will be based upon scientific facts and data, and is the product of reliable principles and methods, and is the same testimony that federal courts have consistently found to be admissible under *Daubert*.   *See United States v. Johnson*, 2015 WL 5012949, at *6 (N.D. Cal. Aug. 24, 2015); *United States v. Reynolds*, 2013 WL2480684, *5 (E.D. Mich. June 10, 2013) ("[t]estimony about cellular phone technology and the ability to determine the general area where calls are placed and received has been widely accepted by federal courts"); *United States v. Jones*, 918 F.Supp.2d 1, 5 (D.D.C. 2013) ("[t]he use of cell phone records to locate a phone has been widely accepted in both federal and state courts across the country").   SA Freund's testimony without question satisfies the requirements under *Daubert*, as nothing about his testimony is out of the ordinary or outside the established scientific principles of historical cell-site location analysis.

A *Daubert* hearing, moreover, is unnecessary. The Eighth Circuit does not require one. *See Solorio-Tafolla*, 324 F.3d at 965.    "Federal Rule of Evidence 702 permits a district court to allow the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding an area involving specialized subject matter." *United States v. Molina*, 172 F.3d 1048, 1056 (8th Cir. 1999).

SA Freund is qualified based on his training and experience, the scientific principles the witness will rely upon are sound, testimony of this nature is routinely admissible in both state and federal courts, and he personally has testified as an expert in this area dozens of times in the past. To the extent Defendant asks this court to hold a *Daubert* hearing to determine the admissibility of SA Freund's testimony, the Government respectfully asks this Court to deny such a request.

### I.   <u>Case Agents/Witnesses Testifying on More than One Occasion.</u>

One of the witnesses for the United States, specifically DEA TFO Joseph Somogye, may be testifying in this case on more than one occasion. This case involves a wide array of law enforcement activity over more than three years. TFO Somogye will testify regarding the defendant's use of a specific cellular telephone in late 2019; the DEA's homicide investigation; defendant's drug distribution in 2020; details surrounding the surveillance and arrest of the defendant in 2021; the execution of premises search warrants and subsequent evidentiary seizures in 2021; and defendant's statements in 2021. Because of the nature of TFO Somogye's investigative activity, the variety of the subject matter to which he will be testifying, and the extended period of time over which his testimony will cover, it would greatly add to the confusion of the jury and other trial participants if they were expected to testify about the incidents in which they participated or were knowledgeable during a single appearance at trial.

Accordingly, the United States intends to present TFO Somogye's testimony in several appearances, the goal being to make his testimony intelligible to, and chronological for, the jury and others, and to place it in the proper context with respect to the progression of the evidence presented at trial. Consistent with this goal of an orderly and understandable trial, the United States requests that the cross-examination of this witness who will be testifying more than once be limited to the subject of his direct examination.

The Eighth Circuit has commended such a procedure as a "way to clearly present an organized factual recital in an extended conspiracy trial." *United States v. Jackson*, 549 F.2d 517, 529 (8th Cir. 1977). In *Jackson*, the witness in question was subject to cross-examination only on the subject matter of each successive appearance (as well as credibility), until his final appearance when a full cross-examination was permitted. In finding such a procedure appropriate, the court noted that this manner of presentation "provided each defendant with numerous opportunities for cross-examination as to both credibility and the subject matter of his testimony." *Id*. at 528; s*ee also United States v. DeLuna*, 763 F.2d 897, 911 (8th Cir. 1985) (holding that testimony in installments was not an abuse of discretion noting that "[i]n this circuit, the manner and order of interrogation and presentation of evidence are matters committed to the discretion of the district court."); *United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (upholding district court's ruling that case agent take the stand on four separate occasions to describe the underlying events in chronological order where witness was subject to cross-examination at each appearance as to matters covered during that portion of direct examination); *see also United States v. Puckett*, 147 F.3d 765, 770 (8th Cir. 1998); United States v. Dimora, 843 F. Supp. 2d 799, 822 (N.D. Ohio 2012); *United States v. Edelin*, 128 F. Supp. 2d 23, 47 (D.D.C. 2001).

The United States District Court for the Eastern District of Missouri has granted motions approving this method of witness presentation in several cases. *See*, *e.g*., *United States v. Anderson*, Case No. 4:13-CR-00164-RWS; *United Sates v. Williams*, Case No. 4:08-CR-00566-CDP, *United States v. Burris and Dillon*, 4:17-CR-95-RWS. Most recently, in *United States v. Hill*, 4:17-CR-310-RLW, the District Court granted the United States' request to call an agent multiple times to testify to allow for chronological presentation of the evidence.

53

## V.    CONCLUSION

The foregoing are the issues that the Government expects to arise in the trial of this matter. Should additional issues arise that have not been addressed, the Government requests the opportunity to provide additional briefing.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney

*/s/ John Mantovani*
JOHN MANTOVANI, #53593MO
GEOFFREY S. OGDEN, #66930MO
Assistant United States Attorneys
111 S. 10th Street, 20th Floor
St. Louis, MO 63102
John.mantovani@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon, David Bruns and Matthew Radefeld.

*/s/ John Mantovani*
JOHN MANTOVANI, #53593MO
Assistant United States Attorney